### The PROFESSIONAL PLANT GROWERS ASSOCIATION, Plaintiff,

v.

### DEPARTMENT OF AGRICULTURE, Defendant.

Civil Action No. 95–0293 (JR).

United States District Court, D. Columbia.

Oct. 8, 1996.

James R. Cannon, Jr., Stewart & Stewart, Washington, DC, for Plaintiff.

Fred E. Haynes, Assistant U.S. Attorney, Washington, DC, for Defendant.

### MEMORANDUM

ROBERTSON, District Judge.

Plaintiff, a trade association whose members include growers of ornamental potted plants, challenges an amendment by the U.S. Department of Agriculture Animal and Plant Health Inspection Service (APHIS) of its regulation 7 C.F.R. § 319.37–8, governing the importation of certain potted plants. The amendment permits the importation, in specified types of growing media, of four plant genera that could previously be imported only with bare roots. The regulatory question for APHIS, which APHIS answered in the negative, was whether importation in growing media increased the risk of the introduction into the United States of new plant pests or diseases.

The plant growers' claim is that APHIS' conclusion, and thus the amendment, was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, 5 U.S.C. § 706(2)(A). They seek a declaration that the amended regulations are unlawful, an injunction against their implementation, and an order rescinding them; or (in the alternative) a remand to APHIS with instructions to reopen the record.

The parties have filed cross-motions for summary judgment. This memorandum explains the Court's conclusion that critical data were not withheld from the record, and that the rule is not arbitrary or contrary to law. The government's motion will be granted, and the plant growers' motion will be denied.

### BACKGROUND

APHIS published its notice of proposed rule making on September 7, 1993, 58 Fed. Reg. 47074. Public comments were solicited and received. A public hearing was held on October 26, 1993, in Washington, D.C. The final regulation was published on January 13, 1995. 60 Fed.Reg. 3067.

The APHIS proposal was to amend regulations earlier promulgated under the Plant Quarantine Act, 7 U.S.C. § 151 et. seq., and the Federal Plant Pest Act, 7 U.S.C. § 150(a) et. seq. Those statutes authorize the Secretary of Agriculture to prohibit or restrict the importation of plants and plant products in order to prevent the introduction of any plant pest new to the United States or not theretofore known to be widely prevalent or distributed within and throughout the United States. Longstanding regulations published at 7 C.F.R. § 319.37 through 319.37–14—known as the "Quarantine 37" or "Q37" regulations—govern the importation of nursery stock, live plants, roots, bulbs, seeds, and other plant products that are propagative. The Quarantine 37 regulations provide that propagative plant materials not otherwise prohibited may be imported, under restrictions, so long as they are handled in accordance with specified procedures for their inspection, treatment or handling so that the

risks of spreading plant pests is "essentially eliminated."

APHIS at first proposed to permit the importation into the United States in growing media of five plant genera, *Anthurium, Alstroemeria, Ananas, Nidularium,* and *Rhododendron.* APHIS also proposed to add to the list of approved non-soil "growing media" several new ones: baked expanded clay pellets, perlite, polymer stabilized starch, cork, volcanic rock, and rock wool.

In its notice, APHIS described the analytical process it had undertaken, involving experts both within and outside USDA, to determine whether the five proposed new genera could be imported in growing media without introducing or disseminating plant pests. A "pest risk assessment group" had concluded that a number of pests associated with the five genera would indeed present a risk of introduction into the United States, with substantial harmful consequences, unless mitigation measures or safeguards were in place. A second group, from within the Department of Agriculture, considered the mitigation measures *already in effect* for plants imported in growing media, 7 C.F.R. § 319.37–8(e), and concluded:

> "These requirements are an effective barrier to contamination of the articles by many pests, especially insects. We believe, based on years of experience in enforcing these requirements and studies of the growing facilities that apply them, that greenhouses meeting these requirements are highly effective in excluding injurious plant pests. Studies also show that unused growing media of the type allowed by the requirements are free from injurious plant pests. If plants that are brought into these greenhouses and established in unused growing media are also free from injurious plant pests, there is a high probability that the plants will remain free from pests and diseases during their growing period in the greenhouse."

The APHIS notice also noted that all five of the genera were already permitted importation as bare-rooted plants and that there had been no reports of the introduction of plant pests associated with such importation. Nevertheless USDA proposed, in addition to the existing mitigation measures, that the mesh size of greenhouse screens be reduced; that visual inspection of the parent stock be required; that a minimum time for growing in greenhouses meeting U.S. standards be imposed before plants could be exported to the United States; that plants descended from other plants imported from a third country be subjected to these requirements; and that monitoring be required for plants being grown in greenhouses for export to the United States.

The notice set forth the standard upon which APHIS proposed to act: to allow importation of an article in growing media "only if the risks associated with the importation [taking into account mitigation measures] are equal to or less than the risks associated with importing the article with bare-roots." The notice recited APHIS's provisional determination that, indeed, the five proposed genera could safely be imported in growing media if subjected to the additional mitigation safeguards noted above. The notice also addressed the economic impact of the new rule, noting that its overall economic effect would be lower prices to U.S. consumers but increased competition for small producers.

The final rules, published by USDA some sixteen months after issuance of the notice, provided for the importation of four of the five proposed new genera. Final action on *Rhododendron* was deferred pending consultation with the Fish and Wildlife Service under the Endangered Species Act.

Plaintiff filed this action on February 13, 1995, the date the final rule became effective. The Court heard a motion for preliminary injunction on March 14, 1995, and denied it on March 21, 1995.

The government moved for summary judgment on April 6, 1995, advancing three broad arguments designed to dispose of all of plaintiff's complaints. First, the government argues, *Chevron* deference is due the Secretary's determinations under the Plant Quarantine Act. Second, the government denies that information critical to the Secretary's decision was not publicly known. Third, the government denies that it ignored or disregarded scientific evidence and as-

serts that the decision is adequately supported by the administrative record.

Plaintiff's opposition to the government's motion, and its cross-motion filed on June 2, 1995, focused on plaintiff's central claim that critical information was omitted or withheld from the APHIS record. The relief plaintiff seeks is a stay of the final rule and a remand to APHIS for supplementation of the administrative record and to permit interested parties to comment on the supplemented record. If that relief is not granted, however, plaintiff continues to assert that the rule as issued is arbitrary and capricious.

### Discussion

Plaintiff's principal attack upon the amended regulation is its assertion that APHIS did not disclose "studies, reports, or recommendations by the [internal USDA] Risk Management Group." Plaintiff's Memorandum p. 7. The government's response is that the amendment was adopted under the APA's informal "notice-and-comment" process, 5 U.S.C. § 553(b), and that it was required only to give notice, provide the opportunity for the submission of comments, and issue with the final rule a concise general statement of its basis and purpose. *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 35 (D.C.Cir.), *cert. denied* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 *reh'ing denied* 434 U.S. 988, 98 S.Ct. 621, 54 L.Ed.2d 484 (1977). If USDA has provided "sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully," *American Water Works Assoc. v. EPA,* 40 F.3d 1266 (D.C.Cir.1994) (quoting *Florida Power & Light Co. v. U.S.,* 846 F.2d 765, 771 (D.C.Cir. 1988)), and if USDA has not withheld from the public data that all "critical" to the evaluation of the proposed rule, see, e.g., *Community Nutrition Inst. v. Block* 749 F.2d 50, 57–58 (D.C.Cir.1984); *Assn. of Data Processing Service Organizations v. Board of Governors,* 745 F.2d 677, 684 (D.C.Cir.1984); *Portland Cement Assn. v. Ruckelshaus,* 486 F.2d 375, 393 (D.C.Cir.1973), then the procedural requirements of informal rule making have been met, and what remains to be determined is whether the rule as adopted is arbitrary, capricious, or contrary to law.

■ USDA has addressed, point by point, each of the thirteen particular reports, studies, test results, letters, and other documents plaintiff asserts should have been or must now be included in the administrative record. *Compare* Plaintiff's Memorandum in Support of Cross-motion for Partial Summary Judgment, pp. 43–44, *with* Defendant's Opposition to Plaintiff's Motion for Summary Judgment, pp. 8–17. The government's response, supported by the declaration of Peter Grosser, is not factually disputed. The argument about the administrative record has narrowed to five documents or information categories that plaintiff asserts, and defendant denies, were "critical" to the final rule.

Those documents or information include pest intercept reports (and computer printouts of pest intercepts), "actionable pest lists," the methodology used in experiments conducted on ferns and African violets in the Netherlands during 1974–1980, experimental data from the same 1974–1980 tests, and written reports of U.S. entry of the 1974–80 test plants. Extensive oral argument was heard on the question whether those data were "critical" within the meaning of that word assigned by controlling precedents such as *Community Nutrition Institute v. Block,* 749 F.2d 50, 57–58 (D.C.Cir.1984), and *Assn. of Data Processing v. Board of Governors,* 745 F.2d 677, 684 (D.C.Cir.1984).

Plaintiffs' procedural claim that the administrative record omits "critical" data mirrors its substantive claim that the APHIS decision to allow importation of the plant genera was arbitrary. The essentials of those claims may be summarized as follows:

Between 1974 and 1980, APHIS conducted a study of five ornamental plants grown in the Netherlands and in Israel and determined that they could be imported in growth media without added risk of importing exotic pests. APHIS then concluded that those five plants—African violets, ferns, gloxinia, begonia and peperomia—might be imported in growing media, if potted and grown in accordance with specified conditions. U.S.Fed. Reg. 31572, May 13, 1980. APHIS apparently thought there was not enough evidence at that time to establish that other plants could safely be imported under such conditions:

"The criteria were formulated based on an experimental program involving the five categories of articles.... Based on Departmental expertise, it appears that determinations concerning the risk of introduction of diseases and pests with the importation of categories of articles cannot be made without testing of the categories of articles in question. There has not been sufficient testing to establish that other categories of articles could be imported in such growing media without a significant risk of introducing such diseases or pests."

45 Fed.Reg. at 31582. Less than two years later, however, without additional testing, the regulation was again amended to permit the importation of hyacinth in growing media, 47 Fed.Reg. 3086, January 22, 1982.

Starting in the early 1980's, APHIS received requests for the addition of 60 additional plant groups to the approved list. No further testing was done, but APHIS's Biological Assessment and Taxonomic Support section performed risk analyses. Then, relying principally on nearly twenty years of experience with the importation of many millions of African violets, ferns, gloxinia, begonia, peperomia and hyacinth, and after providing for more stringent safeguards for the propagation and growing conditions of ornamental plants, APHIS decided to add *Alstroemeria, Ananas, Anthurium* and *Nidularium* to the list.

Plaintiff complains that it cannot test the APHIS decision or properly dispute it—and that the Court cannot perform an adequate judicial review—because not all the data on which the decision was based are found in the public record: the methodology of the African violet and fern study has been lost; the experimental data apparently exist but are "on file in the Netherlands"; records of the inspections of the African violets and ferns when they entered the United States probably were destroyed ten years ago; "pest intercept reports" produced over the years are not in the administrative record, nor has a pest intercept database been made available for analysis; and it is not even clear what the plant inspectors have been looking for, because "actionable pest lists" issued for their use no longer exist. Thus, plaintiff submits, relying particularly on *Almay, Inc. v. Califano*, 569 F.2d 674 (D.C.Cir.1977), either the record before the court is not adequate to permit judicial review, or the record, such as it is, provides no rational support for the challenged amendments.

A number of plaintiff's assertions about withheld data do not withstand scrutiny. Pest intercept reports were and are publicly available, either at land grant colleges or on computer databases, and plaintiff had access to them. Transcript April 23, 1996, p. 18. It is true that there is no description of the methodology used to extract nematodes and isolate pathogens from fern samples during the 1974–80 study, but a written report concerning the shipment of plants in media during that study does exist and was part of the administrative record. Declaration of Peter Grosser ¶ 10. There were no all-inclusive actionable pest lists *id.* ¶ 16, but in any case it is not asserted that actionable pest lists had anything to do with the APHIS decision. The assertion, rather, is that, had they been in the record, opponents of the rule might have been able to use them to discredit APHIS' finding that no pests were obscured on the millions of plants imported since 1980.

As for the remaining, assertedly critical, documents or data, plaintiff has failed to establish, or to persuade, that they were "the most critical factual material that [was] used to support the agency's position on review," *Ass'n of Data Processing*, 745 F.2d at 684, or that they were "entirely new information 'critical' to the Secretary's determination," *Community Nutrition Institute*, 749 F.2d at 58. The key to APHIS's decision to allow importation of *Alstroemeria, Ananas, Anthurium* and *Nidularium* is not the 1974–80 African violet and fern study, but the fact that "no exotic pests have ever been found" during "20 years of importations" of plants in growing media, 60 Fed.Reg. 3069, plus the development of new requirements for inspection, handling, and growing conditions that APHIS believes will "clearly provide better pest protection than the requirements now contained in § 319.37–8." 60 Fed.Reg. 3068. It is not important to adequate judicial review that the 1974–80 test methodology and inspection reports no longer exist, or that data from the test are "on file in the Netherlands," because the test itself does not ap-

pear to have been "critical" to the APHIS decision.

The substantive question remaining for consideration is whether APHIS had an adequate basis on which to decide to permit the importation of new plant genera, or whether its decision was arbitrary. The case upon which plaintiff relies most heavily, *Almay, Inc. v. Califano*, 569 F.2d 674 (D.C.CIR.1977), is germane but sharply distinguishable from this one · on its facts. In *Almay*, the Court of Appeals held arbitrary and capricious the definition of the word "hypoallergenic" in a regulation issued by the FTC, after reviewing the record and concluding that "[t]he only bases in the administrative record for the Commissioner's definition are conclusions drawn from a dictionary that does not employ the chosen definition, an AMA report recommending against any use of 'hypoallergenic,' and an FTC survey, the unreliability of which is apparent on its face and indicated by its sponsor." 569 F.2d at 682. Here, by contrast, the administrative record reflects a careful literature review, the use of a team of outside experts to identify risks and another team of APHIS scientists to develop an approach to risk management, and detailed consideration of comments received from the public.

Plaintiffs have raised interesting questions about the merits of the APHIS decision. They ask, for example, what evidence APHIS has that raised benches and finer mesh screens in foreign greenhouses will keep pests from ramiliad, a type of *Ananas* noted by the Florida Department of Agriculture to be "particularly dirty" because it holds water, Transcript April 23, 1996, pp. 24–25. They wonder whether APHIS has any basis other than its syllogistic reasoning for concluding that (1) that because importation with bare roots has proven clean, and (2) the specified growing media are clean, it follows that (3) importation in growing media will be clean, Transcript April 23, 1996, pp. 48–49.

These questions, however, do not reach the central reasons for APHIS's decision. Unlike *Portland Cement Association v. Ruckelshaus*, 486 F.2d 375 (D.C.Cir.1973), remanded by the Court of Appeals for clarification because the court could not determine "what, in fact, formed the basis for the standards promulgated by EPA, ..." *id.* at 395, it is

reasonably clear from the record of the instant case that APHIS simply found no problems with the earlier importation of plants in growing media and concluded on the basis of that experience that four more could be added to the list. A careful review of the record reveals no "clear error of judgment" and establishes that "the decision was based on a consideration of the relevant factors." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). It is not for this court to substitute its judgment for that of the agency entrusted by Congress to decide whether or not plants may be imported.

An appropriate order accompanies this memorandum.

### *ORDER*

For the reasons set forth in the accompanying memorandum, it is this 7th day of October. 1996

**ORDERED** that plaintiff's motion for summary judgment [# 36] is **denied.** It is

**FURTHER ORDERED** that the government's motion for summary judgment [# 24] is **granted.** And it is

**FURTHER ORDERED** that this case is **dismissed.**